Thank you, Your Honor. Samia Birney on behalf of the appellant, Bradley Smith. I'd like to reserve four minutes of my time for rebuttal. May it please the Court. Please remember that this is the entire time, the total time. I see. Thank you, Your Honor. And also, bring the mic down a little because I have a little camera in here. Is that better? Much better. Thank you. Your Honor, I'd like to start today with the issue regarding the exclusion of Mr. Smith's expert witness on CB radio communication, Christopher Lindley. All the, this case dealt with threats made by Mr. Smith against Alfred Henderson over the CB radio. In fact, all the threats at issue in this case were made over CB radio. And both Mr. Smith and Alfred Henderson were regular and active participants in the CB radio community in Modesto, California. And the ultimate issue here for the jury was whether these threats were true threats of violence based on race. And Mr. Smith's defense was that his behavior was typical of CB radio. He was just engaging in the type of behavior and language that happens on CB radio all the time, and he was not making serious threats against Mr. Henderson. Now, the jurors here couldn't be expected to know anything about the specialized context of CB radio. That is why Mr. Smith sought to present expert testimony on the typical practices. Well, first of all, what is the legal standard here? Is the legal standard whether Mr. Henderson would have believed it or whether some reasonable person would have believed it? No, Your Honor, the legal standard here is set out in Jury Instruction 32, which is at ER 619. And that is whether Mr. Smith subjectively intended to convey a serious expression of an intent to inflict physical harm to Mr. Henderson or his property. But I thought that part of the standard is he didn't have to intend to do it, but he didn't have to intend it, the person to whom he was saying it, to believe it, right? That's not what the standard that the district court adopted here. The district court very specifically, we had briefing on this issue, and what you were saying, Your Honor, is what the government was proposing. But the district court here adopted a slightly different standard, which was whether Mr. Smith here subjectively intended for Mr. Henderson to believe that he was making serious threats. That's what I just said. But my question is whether it's Mr. Henderson who has to believe, whether he has to subjectively believe that Mr. Henderson would believe it or whether he would subjectively intend that a reasonable person would believe it. No, no, that Mr. Henderson here. I'm sorry. I thought you had said it was a reasonable person. No, that is the difference here, that it's not that a reasonable person would believe, but that Mr. Henderson would believe. And if it's a question of Mr. Henderson's belief, isn't one of the relevant factors that goes along with that the conduct that followed? That is, in terms of what his understanding was of the communication. You know, people will frequently say in response to something in anger, I'm going to kill you, and nobody takes that seriously. On the other hand, if it's then followed up by something that really reflects a potential killing, doesn't that cast a light on the intent in connection with the communication as understood by the hearer? That's right, Your Honor. I agree with that. And, Mr. Henderson, evidence of that was admitted by the district court, and evidence of that was presented by the jury. So that Mr. the expert was not going to be testifying about that, but other witnesses did testify about certain follow-up incidents, and that evidence was allowed to come in. But if the expert doesn't take all the factors into consideration, the so-called expert, we don't by the way, the word expert really ought to be out of the system. It's an opinion witness that we're talking about. Jurors, when they're told this is an expert, but you don't have to believe them, that's somewhat contrary to ordinary expectations. So let's call them opinion witness, maybe. I'll do that, Your Honor. That's right. Well, Mr. Smith was proffering the opinion witness to talk about the context of CB radio, and especially about the fact that operators on CB radio typically engage in a competition. They're always fighting for air time. They're fighting to be king of the radio suit, so to speak. They're fighting to dominate the airwaves. And in attempting to do that, they use awful language, offensive language, slurs, insults, threats, anything they can do to raise their own profile and to force their competition off the air. Was this witness going to testify about CB radio generally, or just about what they do in Modesto? He was going to testify about CB radio generally, and that also he was going to testify, as he did at his Daubert hearing, that the general verbal styles and conventions crosscut across CB radio communities. The patterns prevail across the country in urban and suburban CB radio communities. There are not huge differences there, is what his testimony was going to be. And our contention is that his testimony, especially about this practice of radio ramboing, which is the use of verbal attacks and aggressive language to try to force other operators off the air, would have been important predicate information for the jury to consider in making the decision on the ultimate issue, which is whether Mr. Smith was simply engaging in radio ramboing or whether he was making true threats or serious threats of race-based violence against Mr. Henderson. And this court has, in previous cases, approved the testimony of experts, police detective experts or opinion witnesses on gang culture and in cases of also to testify regarding typical practices of drug traffickers, encoded drug language, and... Isn't it somewhat different, though, if, for example, an experienced officer gets on and says that when these people said tires, what they really meant was cocaine? That's really providing a vocabulary that an ordinary jury would not understand, which is, of course, the test for whether 702 is going to apply. Isn't that quite different from the thing that you're contending for? No, I don't think so, Your Honor, because the cases have emphasized that these police detectives are allowed to testify as opinion witnesses because of their experience in those specific types of cases. And the cases have said, for example, United States... But there are two issues. One is, is he an expert? And the other is whether his testimony would aid the jury, which is a different question, and that's where I think the question is here. I mean, he seems to be as much an expert as the police who are testifying about drug culture, but the question is, I think, what Judge Schader is suggesting, how do you meet that standard? And you're suggesting there's something unique about this culture that other people would not get. That's right, Your Honor. And that is based on the fact that most of us have never heard or participated in CB radio exchanges. We don't – most jurors wouldn't be expected to be listening to CB radio exchanges or have any familiarity with what goes on. The best analogy is really to the gang cases. That's right, Your Honor. More than the drug cases. Yes. In the gang cases, they're doing pretty much exactly that. They're saying when gang people do this, they're trying to accomplish that because that's the way gangs work. That's a perfect analogy, Your Honor, the gang cases and gang culture. My problem is we shouldn't be allowing that either, but we apparently do occasionally. Yes. Under the precedents, those – that sort of testimony has been admitted numerous times, and our contention is that Mr. Lindley's testimony would have been no different. And, in fact, he testified at his DARPA hearing that he had listened to 20,000 hours of CB radio exchanges over two decades. And if you think of a typical person working 40 hours a week for a full year, that only means – Well, was he going to testify – there was a proffer. Was he going to testify that he had heard threats at this degree of specificity, continuity, and race-based animus? But did he have examples like that? Yes, Your Honor. He would say that the language at issue in this case was consistent with – consistent with language that he has heard repeatedly in the course of his time listening to CB radio. But that doesn't prove a lot about whether there were threats or not. He might have heard it, but they may have been understood as threats by the people to whom they were directed. He said in the CB radio community he would testify that they were just taken as more of this puffery. But how is he qualified to say that? He's qualified to say what he heard, but how is he qualified to say how people understood it? He – you know, he has been on CB radio for two decades, and he would just testify that in his experience, this sort of language was heard all the time and was not taken seriously by any of the participants. You know, he would – he could only testify to that general point, that as a general rule. Are you going to say anything about the – the intent to carry out the threat? Yes, Your Honor. I would definitely want to address that issue. And with the intent to carry out the threat, our contention is that the district court clearly erred in finding that there was conduct, evidencing, and intent to carry out the threat. The district court applied the six-level enhancement under Guideline 2A6.1, subsection B1, and – So, I mean, he went – they went there, right? So the question is, what – what – so he did something that suggested an intent to do something. So the question is, what was the threat, and was what – why wasn't the fact that he went there evidence that he intended to carry it out? That's exactly right, Your Honor. Our point is that the district court didn't identify which threat he was relying on in applying this enhancement. And the district court made clear that the conduct the district court was looking at was solely one incident, which is that October 28th incident when Mr. Smith and some of his friends went over to Mr. Henderson's house. That was the conduct. But what threat is this conduct evidencing an intent to carry out? That threat is where the district court was silent, and the district court, in fact, questioned what probative value the bare fact that Mr. Smith went over to Mr. Henderson's house had. The district court said, well, Mr. Smith could have just gone over for a fistfight. And as I understand it, this is the district court saying, there was no threat of coming – of having a fistfight. So what does this incident actually prove? After the district court said that, it went ahead and applied the enhancement anyway. And the threat – the one threat that did come up between the district court and the prosecutor when they discussed this issue was a threat of lynching that the government suggested had been made immediately prior to when the district – to when Mr. Smith went over to Mr. Henderson's house. And our contention is that simply going over to Mr. Henderson's house is not sufficient evidence that Mr. Smith was going to carry out a lynching. The government didn't meet its burden here. The government didn't present any evidence that there was a rope or a plan with the other people who went over. You have about a minute and a half left. Yes. I'll save the rest of my time for rebuttal. Thank you. McElderry. Good morning, Your Honors. I'm Marie McElderry for the United States. I guess I'd like to start with the issue that we just finished up with. The – whether the district court erred in finding that Mr. Smith evidenced conduct or showed conduct evidencing an intent to carry out the threat. The court had said that why else would Smith have come with a gang of people, other than to say, we're here, we're ready. This was one man who had been subjected to almost two years of threats, racial threats of the most horrible nature, including raping his wife. So our position is that we didn't have to show that Mr. Smith came with the threats if he had just come to Mr. Henderson's house by himself just to talk, which at one point they had had a meeting like that, just the two of them. They had met in a parking lot and they had talked. But this was something more. And the evening right before he came to Mr. Henderson's house, there was testimony that he – there were all of these threats going on. There was a little gathering at Mr. Smith's house, and some people talked about having us a hanging. And Mr. Smith told FBI agent Tam that it was his idea to go, and he gathered up his friends. And there were about six or seven people that showed up in Mr. Henderson's house after he had just heard all of these horrible threats. He was worried about his wife who had just gotten out of the hospital and her ability to defend herself or him to defend her if they were going to carry out some kind of a rape. And it was a very scary thing. And I think that all of those circumstances taken together show that the Court did not clearly err in finding that there was conduct evidencing an intent to carry out the threats. As to the expert witness – I'm sorry, the opinion witness. Ginsburg. Well, just to go back a minute. Oh, sure. So the threats would be the threat of lynching or the threat of rape, which presumably wouldn't have needed materials? Right. Right. Because there was no evidence that it brought it. I don't think it's done or anything else. No. I don't think a thorough search was done of all of the cars or anything. But, no, there was – we're not contending that there was – that the records showed evidence that he came for a lynching or to burn a cross. We're saying that there were all of these threats, and there was no reason for him to be there with a gang of friends other than to show, as the Court said, we're ready, we're here, you know, let's get it on. But it does have to be something they threatened to do, right? Well, they threatened a lot of things over the CB radio, and we're suggesting that as far as Henderson was concerned, all of those threats were going through his mind. He testified that he was afraid they were going to harm his wife. He wasn't exactly parsing out what they had said that night. I think he was thinking of all of the threats. But that's not the question at this point. The question is an objective question of whether they intended to carry out some specific threat they'd made. Well, whether they showed – whether there was conduct by Smith showing – evidencing an intent to carry out a threat. And we submit that going – But it doesn't have to be evidencing a subjective intent to carry out the threat. It doesn't have to be evidence of an objective ability to carry out the threat. I mean, there has to be both a subjective intent and conduct evidencing it, right? Yeah. Yeah. What the guideline requires is conduct evidencing it. By evidencing what? Evidencing a subjective intent. That – that he is – that they have gone as a gang after making racial threats. All right. So why do you say that they had a subjective intent to do and had conduct evidencing it? To – we don't know, because the police showed up – But don't you have to know? That's what I'm trying to find out. Don't you have to know that there was a threat that was made, that they had a subjective intent to carry out, that they did conduct evidencing of the intent to carry out? How can you not know? Well, you have the – the guideline requires conduct evidencing an intent. Why? But some particular threat. What threat? It could have – it could have been any of the threats. Okay. Well, give me one that it could have been. To harm his wife. We don't know what – and certainly, you know, there was much made of the fact that Mr. Smith brought a whole group with him. It was meant to be a show of force that, you know, that we are here and we're ready. And it – we don't have to show, I don't think, that they actually had the implements of a cross-burning or a lynching with them, just that they showed – he – Mr. Smith did conduct evidence of the intent to carry out his threat because he went and because he rallied the troops to come with him. Well, I'm somewhat puzzled by the statement of issues because it – as I read it, the statement of issues does not go to the conviction so much as – leaving aside for a moment the question of the opinion witness – it doesn't go so much to the conviction as it does to the factors that entered into sentencing. So are you saying that we're not really to look at whether it's sufficient for conviction purposes to have made the kind of showing that's involved and that, therefore, we don't have to look at that part, but we really look only at the sentencing aspects? If we're talking about this conduct evidencing and intent, yes, it's only for sentencing and for the enhancement under 2A6.1b1. No. Because the conviction doesn't require conduct. It just requires a threat. That's right. Do you want to go on to your other point? Pardon me? Do you want to go on to your other point? You were going to go on to the expert. Oh, to the expert, yes. I can't stop doing it now. The opinion witness. It is our contention that the district court didn't abuse its discretion in finding that under Rule 702, this opinion expert, opinion witness did not have the qualifications to testify as to what he intended to testify. Is that what the district court ruled? It seems to me it was what he ruled, that he wasn't qualified as an expert, not that he wouldn't help the jury. Is that right? Well, I think he — I think the district court covered all of the factors, said that there were no — there were no methods that he could have used. The degree — Mr. Lindley, when he made his proffer, said, of course, there's some degree of subjectivity here. So how is this different than the gang experts? I mean, I must say that I find the gang experts extremely disturbing. I don't know. But how is this different? It seems to me that it's pretty much exactly what the gang experts do. They go up and they say, well, in the gang world, when people do some X kind of thing, they're intending to enhance their status within the gang, and so that means that they are within the gang enhancement or whatever it is. And why isn't this the same thing? Well, the — Mr. Lindley, although he had listened to a lot more CB radio more generally, did not have any more expertise to help the jury with what it needed to decide than the six lay witnesses that the government put on who lived every day in the Modesto community and heard these threats day after day after day. And I think there was a question earlier about, you know, did Mr. Lindley have the kind of experience where he had ever heard someone do this kind of threatening over a lengthy period of time. He had only been in the Modesto area specifically for a few hours during a period of time when he used to commute up and down the coast for his job. And even the lay witnesses said, you know, this was not the normal kind of thing. These kind of racial threats, the severe threats of, you know, raping someone's wife, cutting off their head, hanging them from a tree. And these were all, like, racially inspired by the history of the civil rights struggle in this country. They were chosen specifically because of that. And that he had never — he didn't have the expertise to testify that when people say these things, they're not going to carry it out because he had never studied that at all. There just were no methods. He said he can't really name any objective tests, methods, or process that can be used to analyze these kind of statements. Nothing beyond a literal translation. So I think the district court — You're not saying that some expert might not have assisted the jury. You're saying he wasn't sufficiently qualified with regard to Modesto? Is that what you're saying? That's correct. He did claim, you know, that things in a place like Modesto are different from things in a very rural area, that there was a concentration of people, and things get a little bit more intense in that kind of a setting. So this really was about Modesto? Well, yeah. It was about what was happening in this case, and that's what the jury had to decide. And it wasn't going to help them to hear that generally people brag and say nasty things to each other. So if the government tries to put a gang expert on, they have to know about that gang? Well, I don't know anything about gang cases. I don't know if there are different kinds of gangs and whether they're that focused on a particular area. But you have to have someone, you know, who actually has a basis for their opinion other than that they've listened to a lot of this and it happens over the radio, because he did not know. He had never followed up to see whether if someone made a threat, they carried it out. He had done no studies of any kind of thing like that. Well, I mean, that seems to me to be the real problem. He can know what they said, but he can't know how people reacted to what they said. Yeah, there's no way. And that was a question for the jury. And the district judge said that he did not think this was going to be at all helpful to the jury because this was plain English that they were talking. And that – I'm sorry. I didn't want to interrupt you. I just – before you step down, I wanted you to help me for a moment on the grand jury issue. Why was Smith's testimony read to the jury in the trial? Well – The grand jury testimony. Well, because he had voluntarily appeared before the grand jury to tell his side of the story. And it was relevant evidence, and the government intended to put it before the jury to show that he had admitted some of the things. Now, when I say that, I think it's important to remember that FBI agent Tam testified about the content of his two May interviews with Smith, and that Smith also admitted to agent Tam many, if not all, of the things that came out in the grand jury testimony. So you're saying that if that was error, it was harmless error? Is that your position? Well, yeah. We're saying it's certainly not error given the totality of the circumstances, not in custody, not under subpoena. It was part of the government's case-in-chief? Yes. Yes. It came out during the testimony of agent Tam, who, as I said, testified to many of these same facts himself. Is there any other explanation why they told him something that wasn't so? Why they told him there was no way he could get a lawyer appointed when, in fact, he could? Out-of-town counsel from Washington, unaware of the CJA plan for the Eastern District of California, just had no idea that there was this discretionary procedure. Certainly did not intend to overbear his will, which is the test, whether it's compulsive, compulsion. And that, you know, it was unfortunate that that happened. And there was an objection made, and this was brought out. Well, there was a motion to suppress. Suppress, yeah. And that was done in this case. Thank you. Thank you. Your Honor, with respect to the issue regarding the sixth-level enhancement for intent to carry out the threat, government counsel said that they don't need to have a specific threat. They just need to focus on the conduct. But there cannot be any meaningful appellate review of what the district court did if this panel has no idea what threat the district court relied on in applying this enhancement. So are you making essentially a procedural point that the district court had to say what threat it was that he evidenced conduct of an intent to carry out? You know, we think that that was required by the language of the guideline. He has to first identify a threat, and then he has to find, make a factual finding that there was an intent, there was conduct evidencing an intent to carry out that threat, and that the district court didn't follow what was required by the guideline and also by not identifying which threat he relied on, there cannot be any meaningful appellate review of his application of that enhancement. And then turning quickly to the expert issue, Your Honor, government counsel pointed to all the testimony from lay witnesses regarding the sort of typical language that did occur in the CB radio community. And the lay witnesses testified that the language of Mr. Smith's threats was atypical in CB radio, and Mr. Smith had no way to rebut all this evidence that was presented against him. He proffered his opinion witness to be able to properly present his defense but also to rebut all the unfavorable testimony. This person's familiarity with Modesto in particular. Your Honor, the district court actually did not focus on that issue at all. In his ruling, that was not the point he was concerned about. The district court never mentioned that the fact that the expert witness hadn't lived in Modesto was a problem. And in fact, Mr. Henderson had lived in Modesto and participated in the CB radio community for only a couple of years. All his experience of CB radio was from Richmond, California, where he had lived for the previous several years. And he testified repeatedly about what is typical on CB radio based on his experience in Richmond. So I don't think that that at all was a dispositive issue there. And I... He actually said 60 to 80 hours that he listened in the Central Valley. That's right. He said he made several runs from San Francisco to Los Angeles and vice versa, and passed many times through the Central Valley. Nine, five, yeah. Yeah. And he also had, you know, he made the point that there was nothing distinctive about the Modesto radio community. And there might be some regional variations, but for the most part, CB radio lingo is CB radio lingo. Okay. And I would also like to turn quickly to the enhancement for aggravating role that the district court applied here. It was a two-level adjustment under Section 3B1.1C of the guidelines. And here, in applying this adjustment, the district court relied expressly on the probation officer's report. And the probation officer's reason for suggesting or for recommending this enhancement was that there were no other participants. The probation officer found that there were no other participants. All right. Thank you. You have set this forth in your brief, and your time has expired. Okay. Thank you, Your Honor. Thank you. The case disargued is submitted for decision.
judges: Shadur, Schroeder, Berzon